UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVSIION

| | | |
|---|---|---|
| SARAH D. SHINAVER , | ) | CASE NO. 3:16-cv-2800 |
| | ) | |
| Plaintiff, | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | THOMAS M. PARKER |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

## I.      Introduction

Plaintiff, Sarah D. Shinaver, seeks judicial review of the final decision of the

Commissioner of Social Security denying her application for supplemental security income

under Title XVI of the Social Security Act ("Act").  This matter is before the court pursuant to

42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because the ALJ's decision was not supported by substantial evidence, I recommend that

the final decision of the Commissioner be VACATED and the matter be REMANDED for

further proceedings.

## II.      Procedural History

Shinaver protectively filed an application for supplemental security income on January

24, 2013.  (Tr. 14)  The claim was denied initially (Tr. 61-75) and on reconsideration.  (Tr. 84-

85)  Shinaver filed a written request for a hearing on March 7, 2014.  (Tr. 86)

Administrative Law Judge ("ALJ") Richard Horowitz heard the case on June 10, 2015.

(Tr. 27-60)  The ALJ issued a decision on July 8, 2015, finding that Shinaver was not disabled.

(Tr. 11-26)  Shinaver requested review of the hearing decision on September 3, 2015.  (Tr. 10)

On September 22, 2016, the Appeals Council denied review, rendering the ALJ's decision final.

(Tr. 6-8)  Shinaver instituted this action to challenge the Commissioner's final decision.

## III.   Evidence

### A.   Personal, Educational and Vocational Evidence

Shinaver was born on November 4, 1962 and was 52 years old at the time of the hearing.

(Tr. 33)  She was living with her husband and 21 year-old son.  (Tr. 33-34)  She completed high

school but did not have any past relevant work experience.  (Tr. 35-37)

### B.   Evidence Related to Shinaver's Physical Limitations

Dr. Tanya R. Baldwin is Shinaver's family doctor and has treated her for hypertension,

diabetes mellitus, chronic back pain, alleged spina bifida[1], dyslipidemia, gout, obesity and

depression.  (Tr. 258-259)  On November 17, 2007, Dr. Baldwin noted that Shinaver has had

back problems "for several years." (Tr. 453)

On January 31, 2013, Dr. Baldwin noted that Shinaver's compliance with treatment had

been fair.  Dr. Baldwin's exam was normal except that Shinaver was positive for arthralgia, back

pain, myalgia, stiff joints, depression and obesity.  Examination of Shinaver's back showed

normal range of motion but left CVA tenderness. (Tr. 260)  Shinaver received nutrition and

exercise counseling. (Tr. 261)

Dr. Baldwin's treatment notes from June 14, 2013 were similar.  Shinaver was not

exercising but was adhering to a low-salt diet.  A review of Shinaver's systems was normal

except for back pain, depression and obesity.  Shinaver now had medical insurance and requested

---

[1]  During the administrative hearing, Shinaver's attorney suggested that it may have been the diagnosis of spondylolisthesis rather than spina bifida.  (Tr. 40)  Nonetheless, Dr. Baldwin's treatment notes do list Spina Bifida as one of Shinaver's medical conditions. (Tr. 258)

a prescription for depression and a renewal of gout medication. Dr. Baldwin prescribed Flexeril, Paxil for depression and Zyloprim for gout. (Tr. 379-384) Treatment notes from August 2013 show little change in Shinaver's physical condition. (Tr. 408-414)

On November 20, 2013, Dr. Baldwin noted that Shinaver's compliance with treatment had been good. Shinaver's diabetes was "under adequate control." Office notes from this visit are similar to prior visits but Shinaver also complained of numbness in her left arm. (Tr. 421-429)

An X-ray taken of Shinaver's back on June 1, 2015 showed moderate to severe degenerative disc disease at the L5-S1 level, and moderate to severe facet arthrosis at L5-S1. Dr. Michael D. Wilson's impression was "Grade 2 anterolisthesis L5 on S1, with underlying lumbar degenerative changes . . . ." (Tr. 524) Dr. Baldwin's office notes reflect her continuing prescription of the narcotic pain medication Vicodin® (Hydrocodone-Acetaminophen). (See, e.g., Tr. 275, 291, 326, 336, 349 . . . 419, etc.) Some of Dr. Baldwin's medical records are not in chronological order in the administrative record.

### C.    Evidence Related to Shinaver's Mental Impairments

Shinaver has also been treated for psychological and/or mental health issues. She started treating with Chandani Lewis, M.D. on September 13, 2013. Shinaver was found to be depressed and tearful but her memory was intact and she could think abstractly. Dr. Lewis diagnosed depressive disorder, dysthymic disorder, and social phobia. She also noted that "[Shinaver]'s main issue is chronic back pain, and the pain is contributing to her depressive symptoms considerably." (Tr. 304, 512) Dr. Lewis decreased Shinaver's Paxil and started her on Neurontin to target the pain on Shinaver's left side and to improve the quality of her sleep. (Tr. 513)

On April 14, 2014, Shinaver was observed to be limping and in pain. She had fallen two weeks earlier. She complained of muscle spasms and difficulty sleeping. (Tr. 488)

Shinaver met with Dr. Lewis on January 21, 2015. She complained of multiple life stressors and was feeling sad and down. She was also having trouble sleeping due to chronic back pain. She reported numbness in her leg. Dr. Lewis adjusted Shinaver's medications and diagnosed major depressive disorder, recurrent episode, moderate degree. (Tr. 477-478) Shinaver continued to report sleep problems due to chronic back pain at her appointment on February 18, 2015. Dr. Lewis increased Shinaver's dosage of Neurontin, which was helping with anxiety but not with Shinaver's pain level. (Tr. 472-473) On May 15, 2015, Shinaver related that her medications and group therapy were helping. Dr. Lewis adjusted Shinaver's medications and continued her therapy. (Tr. 518) Dr. Lewis also completed a medical source statement for Shinaver at this appointment. (Tr. 521-523)

### D. Opinion Evidence

#### 1. Treating Doctor – Tanya Baldwin, M.D. – April 2011

Dr. Baldwin completed a form for Job & Family Services on April 29, 2011, before Shinaver's alleged onset date. Dr. Baldwin checked boxes indicating that Shinaver's walking, sitting, and lifting/carrying were impacted by her medical conditions. She felt that Shinaver could stand or walk for two hours and could sit for four hours in a workday. She further opined that Shinaver could lift six to ten pounds. Dr. Baldwin's hand-written note states that Shinaver "could do a sedentary job." (Tr. 291-292)

#### 2. Treating Psychologist – Chandani Lewis, M.D. – May 2015

Dr. Lewis completed a medical source statement for Shinaver on May 15, 2015. (Tr. 521-523) Dr. Lewis had treated Shinaver once every three months since September 2013. Her

diagnosis was major depression, recurrent moderate, and social phobia. Symptoms that Dr. Lewis had observed were: mood disturbance, anhedonia or pervasive loss of interests, difficulty thinking or concentrating, decreased energy and generalized persistent anxiety. (Tr. 521) Dr. Lewis stated that she was unable to predict how often Shinaver would miss work as a result of her impairments or treatment. She opined that Shinaver had a moderate loss of the ability to perform mental activities at work. (The questionnaire defined moderate loss as "some loss of ability in the named activity but still can sustain performance for at least one-half and up to 2/3 of an 8 hour workday.) (Tr. 522) Finally, in a check-the-box questionnaire, Dr. Lewis opined that Shinaver had a marked loss in her abilities to: complete a normal workday or workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; adhere to basic standards of neatness and cleanliness; and to use public transportation. (Tr. 523)

### 3. Consultative Examiner – Ryan Lakin, M.D. – December 2013

Ryan Lakin, M.D., performed a consultative examination of Shinaver on December 19, 2013. (Tr. 463-466) Dr. Lakin diagnosed chronic low back pain, morbid obesity, hyperlipidemia, hypertension, diabetes, anxiety and depression. He observed that Shinaver's range of motion in her cervical spine was normal. She had mild tenderness to palpation along her lumbar spine. In both supine and seated positions, she tested positive for straight leg raise. She also had decreased grip strength on her left side. Dr. Lakin noted that Shinaver had normal range of motion in her hips, knees, and ankles. (Tr. 465) After completing this physical exam, Dr. Lakin opined that Shinaver would have some restrictions due to her chronic back pain. He believed that she could lift 10 to 20 pounds continuously, 20 to 40 pounds frequently, and 40 to 50 pounds occasionally. The amounts she could carry throughout the workday were estimated at slightly lower amounts. He further opined that she could sit continuously, i.e. more than six

hours in an eight hour workday and could walk "two to six" hours in an eight hour workday with frequent or regular breaks. (Tr. 466)

### 4. Consulting Psychologist – Mark Hammerly, Ph.D. – May 2013

On May 9, 2013, Shinaver met with Mark Hammerly, Ph.D., for a psychological evaluation. (Tr. 293-302) Shinaver presented with a downcast mood and her affect was constricted. She reported feelings of helplessness, hopelessness, and worthlessness. Her speech was clear and her thought process was coherent, goal-oriented, and logical. She was alert and fully oriented. Dr. Hammerly noted that Shinaver's gait and posture were slow and stiff and that she needed to change positions frequently during the evaluation. He diagnosed major depression, single episode, moderate, and assigned a GAF score of 58. Dr. Hammerly opined that Shinaver's abilities to understand, remember and carry out instructions were grossly normal, as were her abilities to maintain attention, concentration, persistence and pace. (Tr. 300-301) He felt that Shinaver would have some difficulties re-adjusting to the workplace because her depression would possibly affect her relations with supervisors or co-workers. He also opined that she would respond with some "decreased effectiveness when subjected to ordinary workplace pressures." (Tr. 301)

### 5. Reviewing Physician – Dr. Olga Pylaeva – April 2013

On April 1, 2013, state agency reviewing physician Olga V. Pylaeva, M.D., found that Shinaver could occasionally lift and/or carry up to 50 pounds; could frequently lift and/or carry up to 25 pounds; could sit, stand and/or walk about 6 hours in an 8 hour workday; could occasionally climb ladders/ropes/scaffolds, stoop, kneel, crouch and/or crawl; and was unlimited in her ability to climb ramps/stairs and balance. (Tr. 70-71)

### 6. Reviewing Psychologist – Robyn Hoffman, Ph.D. – May 2013

On May 27, 2013, state agency reviewing psychologist, Robyn Hoffman, Ph.D., reviewed Shinaver's file and opined that Shinaver was moderately limited in her ability to complete a normal workday and workweek without interruptions from her psychologically based symptoms, and in her ability to respond appropriately to changes in the work setting. Dr. Hoffman thought that Shinaver would be able to complete tasks that did not require a rapid pace or adaptation to rapid/frequent changes. (Tr. 72-73)

### E. Testimonial Evidence

### 1. Shinaver's Testimony

Shinaver testified at the administrative hearing as follows:

- Shinaver amended her claimed initial onset date to October 1, 2012. (Tr. 31)

- Shinaver 's date of birth was November 4, 1962 and she was 52 years old at the time of the hearing. (Tr. 33)

- She lived in a house in Toledo with her husband and her 21 year-old son. (Tr. 33-34)

- She was 5'5 and weighed 202 pounds at the time of the hearing. (Tr. 33)

- She had a driver's license and a vehicle and drove to stores twice a month. She also drove to the hearing. (Tr. 34, 48)

- Shinaver completed high school where she had received training in food service. (Tr. 35)

- Shinaver last worked for about six months in 2001 as a housekeeper for Comfort Inn. (Tr. 36, 37)

- Since then, she had been unable to work due to pain in her back. She also had neuropathy in her legs and feet. (Tr. 37-38)

- Shinaver had been treating with Dr. Baldwin for about six years. She received pain medication which helped to moderate the pain. (Tr. 39) Shinaver had never received any injections, done any physical therapy, or talked to her doctor about surgery. (Tr. 44)

- In addition to back pain, Shinaver had high blood pressure, high cholesterol, and depression. (Tr. 41-42) She also had gout in her left ankle. (Tr. 53) Shinaver was taking medications for her conditions. (Tr. 49)

- When questioned about records noting improvement of her depression, Shinaver responded that she did not feel that it had improved much. The medication she was taking helped a little but caused drowsiness. (Tr. 43) Shinaver also attended a group therapy class every other week. (Tr. 52)

- Shinaver's sleep was interrupted due to back pain. (Tr. 45) She would often lie down and sleep for several interrupted hours during the day. (Tr. 52)

- Shinaver estimated that she could walk half a block; could stand for about a half hour; and could sit for 50 minutes to an hour. She had difficulty pushing or pulling with her arms and legs but had not discussed this with her doctor. (Tr. 47)

- Shinaver estimated that she could lift and carry about ten pounds. She had difficulty but could slowly climb ten stairs in her home. (Tr. 48)

- Shinaver watched TV for entertainment. (Tr. 49)

### 2. Vocational Expert Testimony

Vocational Expert James Fuller also testified at the hearing. (Tr. 54-59)

- The VE was asked to consider a hypothetical individual of Shinaver's age, education and work experience who was capable of medium work, meaning she could lift 50 pounds occasionally and 25 pounds frequently; could sit, stand and/or walk for six hours in an eight-hour workday; she could push and pull as much as she could lift and carry; she could climb ramps and stairs frequently, but could never climb ladders, ropes and/or scaffolds; she could frequently balance, stoop, kneel, crouch and crawl. She could never work around unprotected heights or moving mechanical parts. She could frequently work in conditions where there were vibrations. She was limited to simple, routine, and repetitive tasks, but not at a production rate pace (i.e., no assembly line work.) She could frequently respond appropriately to supervisors, coworkers and the general public and was limited to simple work-related decisions. (Tr. 56)

- The VE testified that this individual could perform the work of dishwasher, packager, and laundry work. There were a significant number of these jobs in the national economy. (Tr. 57)

- The individual would still be able to perform these jobs if she needed to change positions every 30 minutes, and/or if the postural limitation and vibrations in the environment were changed from frequent to occasional. (Tr. 57)

- The VE was then asked to assume the first hypothetical individual but to lower the exertional level to light. With this change, there were still jobs the individual could perform such as packaging, laundry and inspection jobs. When the ALJ also added that this individual would need to have a sit/stand option, jobs still existed but they were reduced by 75%. (Tr. 58)

- No jobs would be available for an individual who needed to lie down for two hours during the day. (Tr. 59)

- The VE testified that normal breaks include a 15 minute break in the morning and a 15 minute break in the afternoon and 30 minutes for lunch. The ordinary tolerance for absenteeism was one day per month and the usual on-task requirement as 90%. (Tr. 58)

## IV. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

_____

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to produce evidence that establishes whether the claimant has the

RFC and vocational factors to perform work available in the national economy. *Id.*


## V.     The ALJ's Decision

The ALJ issued his decision on July 8, 2015. (Tr. 14-26)

1. Ms. Shinaver had not engaged in substantial gainful activity since January 24, 2013, the application date. (Tr. 16)

2. Shinaver had the following severe impairments: obesity, diabetes, degenerative disc disease of the lumbar spine, hypertension, hyperlipidemia and depression. (Tr. 16)

3. She did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 16-19)

4. Shinaver had the residual functional capacity to perform less than a full range of medium work. She could lift 50 pounds occasionally, 25 pounds frequently and could sit, stand and walk for six hours in an eight-hour workday. She could

push and pull as much as she could lift and carry. She could climb ramps and stairs frequently but could never climb ladders, ropes or scaffolds. She could frequently balance, stoop, kneel, crouch and crawl. She could never work at unprotected heights or around moving mechanical parts. She could frequently work in conditions where there are vibrations. She needed to change positions every 30 minutes for one or two minutes in the immediate vicinity of her work station. She was limited to simple, routine and repetitive tasks but not at a production rate (e.g. no assembly line work.) She could frequently respond to supervisors, coworkers and the general public and, in dealing with changes, she could make simple work-related decisions. (Tr. 19-24)

5. Ms. Shinaver had no past relevant work. (Tr. 24)

6. She was born on November 4, 1962 and was 50 years old, which is defined as an individual closely approaching advanced age, when she filed her application. (Tr. 24)

7. Shinaver had at least a high school education and was able to communicate in English. (Tr. 24)

8. Transferability of job skills was not material because Shinaver did not have any past relevant work. (Tr. 24)

9. Considering Shinaver's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform. (Tr. 24)

Based on the foregoing, the ALJ determined that Ms. Shinaver had not been under a disability from January 24, 2013, the date her SSI application was filed.[3] (Tr. 25)

## VI.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed

---

[3] The ALJ explained that under Social Security law supplemental security income benefits cannot be retroactively awarded. Therefore, even though Shinaver had amended her onset date to a date in 2012, her SSI claim was required to be judged as of the January 24, 2013 application date. (Tr. 14)

if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied. If not, reversal is required unless the legal error is harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not

be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.      Residual Functional Capacity

The ALJ, not a physician, is assigned the responsibility of determining a claimant's RFC based on the evidence as a whole.  42 U.S.C.A. § 423(d)(5)(B); 20 C.F.R. § 416.946(c). Pursuant to the regulations, the ALJ must evaluate several factors in determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony. See *Henderson v. Comm'r,* 2010 U.S. Dist. LEXIS  18644, *6-7 (N. Dist., October 13, 2009) citing, *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); SSR 96-5p, 1996 SSR LEXIS 2, SSR 96-8p, 1996 SSR LEXIS 5.  The final responsibility for deciding the RFC "is reserved to the Commissioner."  20 C.F.R. § 416.927(e)(2).  Although the Commissioner is responsible for determining a claimant's RFC, the ALJ must comply with the regulations in evaluating the medical evidence, including the medical opinions in the record.

Shinaver argues that the ALJ erred in determining her RFC because he failed to incorporate the opinions of Dr. Lakin, Dr. Pylaeva, Dr. Baldwin and Dr. Lewis and because he did not explain why those opinions were not fully adopted. Shinaver's argument that the ALJ was required to accept the opinions of these physicians in their entirety finds little support in the law. As noted above, it was the ALJ's responsibility to determine Shinaver's RFC. However, the ALJ's findings of fact must be supported by substantial evidence, i.e. more than a scintilla of evidence. With this in mind, each of the medical opinions and Shinaver's related arguments are analyzed below. I have regrouped Shinaver's arguments for clarity of analysis.

### C.    ALJ's Assessment of Opinion of Consultative Examiner, Dr. Ryan Lakin

One of Shinaver's grounds for contending that the ALJ erred in his RFC finding is based on the claim that the ALJ improperly evaluated the opinion of the consultative physician, Ryan Lakin, M.D. Specifically, Shinaver contends that the ALJ's RFC failed to incorporate Dr. Lakin's opinions regarding how much Shinaver is able to carry; how long Shinaver is able to sit and stand/walk; how many breaks Shinaver requires; and whether any limitations based on grip strength testing Lakin performed should have been included. ECF Doc. 10, Page ID# 75-78. Dr. Lakin was not a treating physician but met with Shinaver once and performed an independent medical evaluation. (Tr. 463)

The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). In determining disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). The Code of Federal Regulations describes how medical opinions must be weighed:

(c) How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

  (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

  (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. ...

  (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...

  (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

  (5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

. . .

20 CFR § 416.927(c).  See also 20 CFR § 404.1527(c).

In considering Dr. Lakin's opinion, the ALJ stated:

R. Lakin, M.D., also evaluated the claimant on December 19, 2013. The claimant was diagnosed with chronic low back pain, obesity, hyperlipidemia, hypertension, diabetes mellitus, anxiety, and depression. Despite these diagnoses, the claimant's examination was generally benign. For example, the claimant's range of motion in her cervical spine, shoulders, elbows, wrists, hands, fingers, knees and ankles were normal. While the claimant had positive straight leg raises, she had no clubbing, cyanosis, or edema, her strength was 5/5, her sensation was intact, and her gait was normal. Moreover, she had no problem standing on one leg, and she was ambulatory without an assistive device. Overall, based on his observations, Dr. Lakin opined that the claimant can lift and carry up to 50 pounds occasionally and up to 20 pounds continuously. He added that she can sit more than six hours and stand/walk two to six hours per eight hour day. (Ex. B9F). These opinions are afforded great weight because they are consistent with the clinical findings and the medical records as a whole.

(Tr. 23)

The ALJ assigned "great weight" to the opinion of Dr. Lakin. Thus, rather than criticize the weight assigned to Dr. Lakin's opinion, Shinaver focuses on specific findings made by Dr. Lakin and argues that the ALJ rejected these findings by not including each of his limitations in the RFC. Shinaver invokes case law requiring ALJs to articulate good reasons when rejecting the opinion of a treating physician. Shinaver's argument has several problems: 1) Dr. Lakin was not a treating physician; 2) the ALJ didn't reject his opinion; and 3) some of Dr. Lakin's findings are ambiguous or at least open to interpretation; and 4) the ALJ arguably incorporated Dr. Lakin's findings into the RFC determination. Consequently, the case law cited by Shinaver is mostly inapplicable to the ALJ's evaluation of Dr. Lakin's opinion. The regulations require the ALJ to evaluate every medical opinion in the record, and, unless giving a treating physician's opinion controlling to consider all of the listed factors when deciding the weight to accord other medical opinions. 20 CFR § 416.927(d); 20 CFR § 404.1527(d). There is no indication that the ALJ failed to properly evaluate Dr. Lakin's opinion. He assigned great weight to his opinion.

The ALJ was not required to assign *controlling* weight to the opinion of Dr. Lakin in this case, or even to provide good reasons for failing to do so. *See Smith v. Comm'r,* 482 F.3d 873,

876 (6th Cir. 2007). Nor was the ALJ required to incorporate all of Dr. Lakin's findings into the Shinaver's RFC. Rather, he was required to evaluate several factors in determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony. *Henderson,* 2010 U.S. Dist. LEXIS at *6-7, citing *Webb,* 368 F.3d at 633; SSR 96-5p. Even assuming that Shinaver is correct in arguing that the ALJ failed to incorporate some of Dr. Lakin's findings into the RFC, this would not necessarily constitute an error in applying the agency's legal standards. As the Commissioner argues, the portions of the ALJ's RFC that Shinaver alleges were inconsistent with Dr. Lakin's opinion find support in the opinions of other medical sources. I would not recommend remand on this basis.

> **D.      Opinions of State Agency Reviewers**

Shinaver next argues that the ALJ erred in by not incorporating certain of the findings of the state-agency reviewing sources, Dr. Pylaeva and Frederick Bormann into the RFC and in failing to explain why his RFC findings were more liberal than those found by the state agency reviewers. In particular, Shinaver points out that the ALJ erred in finding that she was capable of *frequent* stooping, kneeling, crouching and crawling. ECF Doc. 10, Page ID# 78-80. The ALJ stated that his RFC determination was more limited that the state agency reviewers, but Dr. Pylaeva actually found that Shinaver was limited to only *occasional* stooping, kneeling, crouching and crawling. (Tr. 23, 71) Thus, Shinaver argues that the RFC was *less* limited than the state agency reviewers had found, not *more* limited as asserted by the ALJ. She contends that there is no substantial evidence to support this finding and that her claim should be remanded.

As stated above, it is the ALJ's, not a physician's, responsibility to decide the RFC. In doing so, the ALJ must evaluate the entire record, including all of the medical evidence (not

limited to medical opinion testimony), as well as the claimant's testimony. See *Henderson v. Comm'r,* 2010 U.S. Dist. LEXIS 18644, *6-7 (N. Dist., October 13, 2009) citing, *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); SSR 96-5p, 1996 SSR LEXIS 2, SSR 96-8p, 1996 SSR LEXIS 5; 20 C.F.R. § 416.927(e)(2). To require the ALJ to base her RFC finding on a physician's opinion, "would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Rudd v. Comm'r of Soc. Sec.,* 531 Fed. Appx. 719, 728 (6th Cir. 2013), citing SSR 96-5p, 1996 SSR LEXIS 2 (July 2, 1996).

Shinaver is correct in pointing out that the ALJ's RFC finding on her ability to stoop, kneel, crouch and crawl is not supported by any medical opinion in the record. The state agency reviewing physician, Dr. Pylaeva, found that Shinaver was limited to *occasional* stooping, kneeling, crouching and crawling. Regarding this opinion, the ALJ stated:

> The State agency medical consultant opined that the claimant should be limited to medium work with *occasional* climbing of ladders, ropes, or scaffolds, stooping, kneeling, crouching, and crawling. (Ex. B1A). These opinions are afforded some weight because they are generally supported by the evidence. However, based on the recent evidence received at the hearing level and the claimant's subjective complaints, the undersigned finds that the claimant is slightly *more limited* than the State agency medical consultant opined.

(Tr. 23, emphasis added.) Despite stating that he found that Shinaver to be *more* limited than the state agency consultant had found, the ALJ determined that Shinaver was capable of *frequent* stooping, kneeling, crouching and crawling. He offered no explanation for this finding, and the undersigned cannot find any support for it in the record. There are no medical opinions or even medical records showing that Shinaver had a greater ability to stoop, kneel, crouch and crawl

than determined by Dr. Pylaeva. Nor did Shinaver's testimony at the hearing suggest that she was capable of frequent stooping, kneeling, crouching and crawling.

The Commissioner has not refuted this argument. Although she made the generic claim that the finding was supported by substantial evidence, she never backed that up by citing a single item of evidence. Nor does she argue that this finding constituted harmless error. Rather, she focuses on the fact that the ALJ's RFC determination was more limited than Dr. Pylaeva's opinion in other areas. ECF Doc. 11, Page ID# 109-111. She also argues that Frederick Bormann, the other agency reviewer, was not an acceptable medical source. ECF Doc. 11, Page ID# 110. But these arguments fail to address the specific issue raised by Shinaver – that the ALJ's finding regarding Shinaver's ability to stoop, kneel, crouch and crawl was not supported by substantial evidence.

It is certainly possible that the ALJ simply made a mistake on this glaring error, but the court cannot simply assume that is so and order a correction. Because this finding lacks substantial evidentiary support, I recommend that the matter be remanded for reconsideration of Shinaver's RFC.

### E. Treating Source Rule

Finally, Shinaver argues that the ALJ failed to properly evaluate the opinions of her treating sources, Dr. Tanya Baldwin and Dr. Chandani Lewis.

#### 1. Dr. Baldwin's Opinion

On April 29, 2011, Dr. Baldwin completed a questionnaire regarding Shinaver's medication dependencies. (Tr. 291-292) She opined that Shinaver could stand or walk two hours; that she could sit for four hours; and that Shinaver was able to lift/carry six to ten pounds. She wrote a note stating that Shinaver "could do a sedentary job." (Tr. 292)

Defendant contends that the "ALJ did not belabor this out-of-date opinion in his decision because it captured Shinaver's functional limitations a full two and a half years before the relevant date." ECF Doc. 11, Page ID# 112. However, defendant has not cited any authority providing that an ALJ is not required to follow the treating physician rule if the treating source rendered her opinion prior to a claimant's alleged onset date. Moreover, there is no evidence that Shinaver's physical condition improved after Dr. Baldwin issued her statement. In fact, Shinaver has pointed to several pieces of objective medical evidence suggesting that her condition may have been worsening. ECF Doc. 10, Page ID# 81-82.

The ALJ did not specifically discuss Dr. Baldwin's statement. However, regarding the evidence predating Shinaver's alleged onset date he stated:

> The evidence includes objective test results and treatment notes dated prior to the claimant's application date. While considered, the evidence does not provide pertinent information regarding the claimant's residual functional capacity as of January 24, 2013. Therefore, a detailed analysis of the evidence dated prior to January 2013 is unwarranted.

(Tr. 20)

Shinaver asserts that Dr. Baldwin's treating physician statement was not properly considered in a prior SSA claim and that she requested a re-opening of that claim file. (Tr. 209-210) The ALJ neither addressed this request nor specifically considered Dr. Baldwin's statement. Although the ALJ discussed the treatment records from Dr. Baldwin's office – Navarre Family Practice – concluding that the "progress notes, test results and clinical findings do not support the claimant's allegations," he never discussed Baldwin's actual opinions, what weight they should be given and what other deference to which they may have been entitled in light of Baldwin's status as a treating physician. Under these circumstances, the undersigned agrees with Shinaver

that the ALJ's evaluation of Dr. Baldwin's opinions did not adhere to the regulatory procedures. I recommend remand on this additional ground.

## 2. Dr. Lewis's Opinion

Dr. Chandani Lewis completed a medical source opinion on May 15, 2015. (Tr. 521-523) The ALJ afforded "very little weight" to Dr. Lewis's opinions because "they are inconsistent with the clinical findings detailed above and the GAF scores of 55. The treatment notes do not support the claimant's extreme restrictions opined by Dr. Lewis." (Tr. 22) This explanation of the rejection of the opinions expressed by Dr. Lewis appears to be inadequate. It is not enough simply to dismiss a treating physician's opinion as incompatible with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why the treating physician's conclusion gets the short end of the stick. *Friend v. Comm'r of Soc. Sec.,* 375 Fed. App'x 543, 552 (6th Cir. 2010). It is well known that the ALJ must provide "good reasons" when discounting a treating source opinion.

However, in some circumstances, an ALJ's failure to articulate good reasons for rejecting a treating physician opinion is harmless error. These circumstances exist when (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though he has not complied with the terms of the regulation." *Wilson,* 378 F.3d at 547. *See also Cole,* 661 F.3d at 940. In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the

claimant's ailments. *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. Appx. 462, 470-471 (6th Cir.

2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. Appx. 456, 464 (6th Cir. 2005); *Friend v. Comm'r

of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010). "If the ALJ's opinion permits the claimant

and a reviewing court a clear understanding of the reasons for the weight given a treating

physician's opinion, strict compliance with the rule may sometimes be excused." *Friend,* 375

Fed. Appx. at 551.

The ALJ described the treatment Shinaver received for her mental impairments earlier in

his decision:

> The claimant has received care at the Zepf Center through 2015. In August 2013, she
> was diagnosed with major depressive affective disorder. Based on her symptoms,
> including depressed mood, difficulty concentrating, sleep disturbances, fatigue, and
> restlessness, she was assessed with a Global Assessment of Functioning (GAF) score of
> 55, which indicates no more than moderate limitations in social, occupational, and school
> functioning. This score is consistent with the treatment notes and the clinical findings; as
> such it is accorded great weight. However, it is important to note that the claimant's
> medications have been effective in reducing and controlling the claimant's symptoms.
> For example, it was noted that the claimant's affect was appropriate, her memory was
> intact, her intellect was average, she was cooperative, her reasoning, impulse control,
> judgment, and insight were good, and her thought process was logical. (B7F). Likewise,
> in March 2014, it was noted that the claimant was alert and fully oriented with good eye
> contact, a full affect, no delusions, suicidal thoughts, or psychosis, and an organized
> thought process. Furthermore, as of January 2015, it was noted that the claimant denied
> significant changes in her mood, thoughts, and behavior. In May 2015, it was also noted
> that the claimant was doing well on medication, she denied feelings of hopelessness, and
> helplessness, her affect was full, her thought process was logical, her perception,
> cognition, insight, and judgment were normal, and there was no evidence of delusions or
> hallucinations (Ex. B11F). In fact, the claimant was never assessed with a GAF score
> below 55, nor do the treatment notes contain any restrictions or symptoms that would
> preclude her from engaging in substantial gainful activity. Therefore, while these records
> indicate that the claimant has some mental restrictions, they do not support a finding of
> disability. (Exs. B7F, B10F, & B11F).

Here, the ALJ specifically identified treatment notes suggesting that Shinaver's mental

restrictions were mild when treated. Thus, this may be an instance when any error in the ALJ's

failure to identify specific discrepancies between Dr. Lewis's opinion and the treatment record as

a ground for rejecting her opinions is harmless. The ALJ had already provided grounds for discounting the opinion by pointing to notes showing mild mental restrictions reasonably controlled through treatment. I would not recommend remand based on the ALJ's evaluation of Dr. Lewis's opinions alone. However, because I am recommending that the matter be remanded for other reasons, I also recommend that the ALJ upon reconsideration be required to specifically identify the discrepancies between Dr. Lewis's opinions and Shinaver's treatment notes when explaining the weight he assigned to her opinions.

## VII. Recommendation

Because two portions of the Commissioner's decision were not supported by substantial evidence, I recommend that the final decision of the Commissioner be VACATED and that the matter be REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

Dated: December 1, 2017

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**